1
2
3
4
5
6
7
8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

JESSE ADAMS,                        )    No. C 10-0369 LHK (PR)
11                                    )
                Petitioner,           )
12                                    )    ORDER DENYING PETITION FOR WRIT
        vs.                           )    OF HABEAS CORPUS; DENYING
13                                    )    CERTIFICATE OF APPEALABILITY
                                      )
14   FERNANDO GONZALEZ, Acting Warden, )
                                      )
15              Respondent.           )
   _____ )
16

17          Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254, challenging his state conviction.  The Court ordered Respondent to

19   show cause why the petition should not be granted.  Respondent filed an answer addressing the

20   merits of the petition.  (Docket No. 6 ("Ans.").)  Petitioner filed a traverse, albeit after the

21   deadline had already passed.  (Docket No. 8.)  Having reviewed the briefs and the underlying

22   record, the Court concludes that Petitioner is not entitled to relief based on the claims presented

23   and denies the petition.

24

25                              **PROCEDURAL HISTORY**

26          Petitioner was found guilty by a jury in Santa Clara County Superior Court of dissuading

27   or attempting to dissuade a witness by use of force or threat of force (Cal. Penal Code § 136.1,

28   subd. (c)(1)), threats to commit a crime resulting in death or great bodily injury (*id.* § 422), and

1   conspiracy to dissuade a witness from testifying (*id.* §§ 136.1, 182, subd. (a)).  Petitioner

2   admitted to having three prior convictions.  On July 21, 2006, Petitioner was sentenced to three

3   consecutive terms of twenty-five years-to-life, each enhanced by a consecutive 10-year

4   determinate term for two serious felony priors, for a total of 30 years determinate plus 75 years

5   to life in state prison.  Petitioner filed a direct appeal to the California Court of Appeal, which

6   affirmed the conviction and judgment, and a subsequent petition for review in the California

7   Supreme Court, which denied the petition.  Petitioner did not file any state habeas petitions.  The

8   instant federal habeas action was filed on January 26, 2010.

9                           **BACKGROUND**[1]

10        Counts 11 through 15, which charged Eric Adams with criminal
     threats, battery, and brandishing, arose out of events on August 23, 2004.
11   Christopher Huber and Rolando Gonzalez were trimming trees at the home of
     Huber's brother-in-law Justin Perez and his family. The house was on a corner
12   lot in San Jose. Huber was up in a tree and Gonzalez was gathering branches
     below.

13
          A young woman ran up to Gonzalez screaming, "Help me. He's gonna
14   kill me." A white car skidded to a stop and Eric Adams got out. The woman,
     Shante Adams, Eric's wife, was hysterical and her shirt was covered with
15   blood. She got behind Gonzalez and held him in front of her as Eric tried to
     reach around him. [FN1] Eric yelled, "Bitch, I'm gonna kill you. Get back in
16   the car. You know you're gonna get these people hurt." Gonzalez testified that
     Shante was "embracing" him from behind as Eric pushed him by the
17   shoulders and tried to grab Shante. Eric said, "Why are you protecting her?
     Do you want to fight?" Eric yelled, "I'm gonna kill you, bitch. You better not
18   protect her. You're gonna - you're gonna get hurt protecting this worthless
     bitch."
19
          FN1. Because appellants and Shante Adams all have the same last
20        name, we will at times, for convenience and clarity, refer to them by
          their first names.
21
          Huber started to lower himself from the tree. Eric said, "I'm gonna get
22   you. You're gonna get hurt. You know, I see you, tree man. I'm gonna kill
     you, tree man." When Eric "gave up trying to get at the lady" through
23   Gonzalez, he started to leave and said, "You ever heard of the Seven Trees?"
     Huber and Gonzalez understood this to be some kind of gang reference.
24
          Eric left in the white car. Perez and his family tended to Shante's
25   injury in their garage. A few minutes later Eric pulled up, got out of the car,
     and told Gonzalez, "I told you I was going to kill you." He said something
26   about pistols or guns. Eric went to the trunk of the car, opened it, and reached

27   _____

28        [1]  The facts of this case are taken from the California Court of Appeal opinion in *People
     v. Adams, et al.*, No. H030529 (Cal. App. 6 Dist. May 20, 2008).  (Ans. Ex. C ("Op").)

inside. Eric pulled out what Gonzalez thought was a shotgun. Gonzalez ran and hid behind a tree. Eric was holding something covered with a black jacket. It turned out to be a two-by-four. He held it "in the manner of a pistol."

Huber testified that Eric held the two-by-four like a baseball bat and advanced toward them saying, "You're gonna get this family hurt. This bitch isn't worth protecting. We're gonna come back for you. You're making a big mistake." [FN2] Eric said, "You've never heard of the Seven Trees." He said to Shante, "I'm gonna kill you, bitch. I'm gonna kill you." He pointed at Huber and said, "All you people are gonna get fucked up." Eric said to Justin Perez, "You're gonna get your family hurt. We'll get you. She's not worth protecting."

FN2. Huber was impeached with prior criminal convictions.

When Eric left, Huber drove to the corner with Gonzalez and watched the house from a distance for "security." Huber "wanted to see it coming or if it happened again, [he] wanted to be able to follow him or something." The police arrived about five minutes after Eric left and interviewed Huber, Gonzalez, Perez and Perez's wife.

Eric testified that although he "might have yelled a little bit" he never threatened to kill Shante, Huber, Gonzalez, or Perez. [FN3] He said that he and Shante had quarreled that morning because she wanted him to ride with her to Richmond so that she could have access to the car pool lane but that he "didn't want to do it." Shante "got into an uproar" and left. Eric testified that Shante returned and started "purposely agitating" him by throwing things around and then left again. He locked the door and placed a couch in front of it. She returned and, in pounding on the door, broke the window in the door, cutting her arm. When Eric saw that Shante was bleeding, he tried to assist her, but she grabbed a dish towel and "stormed out of the apartment again."

FN3. Eric was impeached with six prior felony convictions.

Eric testified that he tried to follow Shante in the white car to convince her to get medical treatment. When he pulled up next to where she was on the sidewalk to try to talk to her, she "started running towards that house." Eric was telling Shante, "You're stupid, what are you doing, I am just trying to help you." Eric testified that Shante did not scream for help or say that Eric was going to kill her. Gonzalez was cutting branches and holding a saw. From his position up in the tree Huber called, "Get the fuck back, it's not going to happen here." When Shante hid behind Gonzalez, Eric tried to explain that she was his wife and that Huber and Gonzalez had the wrong impression of the events but that Gonzalez and Huber just kept yelling at him to leave. Gonzalez threatened to call the police. Eric testified that he told Gonzalez, "I was going to call [the] I.N.S. on him if he don't get out of my business and have him deported" and Gonzalez put his phone away. Gonzalez became angry and aggressive toward Eric.

Eric testified that he left after telling Shante not to worry and that he would return for her. He went to get a soda and call his mother-in-law to tell her what had happened. His mother-in-law was some distance away, so, rather than wait for her, Eric returned to the Perez house where he had left Shante. Gonzalez started coming at him with the branches in his hand, so Eric reached into his trunk for something with which to defend himself. He found a piece

of wood that happened to have a jacket on top of it and pulled it out. He left a few seconds later.

Counts 1, 2, 3 and 4 arose from telephone contact with Huber. As a result of the August 2004 incident, Eric was placed in custody for a parole violation. Huber, Gonzalez, and Perez testified at an administrative hearing in late 2004. Criminal charges were filed against Eric, and Huber testified at the preliminary examination for those charges in December 2004.

On March 22, 2005, while Eric remained in custody pending trial on criminal threats charges, his brother Jesse Adams was paroled from prison, where he had been for over 14 years. Eric called Jesse and Shante numerous times from the jail. Later that month, Huber received a hang-up phone call. According to Huber's caller ID, the call was from "Leonard Hodge" with a phone number of 270-7483. Although Huber did not know anyone by that name, he tried calling the number back and it was busy for about half an hour. Huber received another call, and the caller ID said "number blocked." Huber testified that when he picked up the phone he "got threatened." In a 45-second call, a man's voice, which was "pretty distinctive" and sounded "like a Mike Tyson impersonation," addressed him by name. The man said, "People that talk, wind up in graves." The man said, "You got a nice house, nice kids. You don't want to lose them.... Do the right thing. You don't want to wind up dead." Huber understood that by "talk" the voice meant "testify... in relation to the case against Eric Adams." Although he took this as a threat to his safety and that of Justin Perez and his family, he did not immediately report this call to the police because he "thought it was all B.S." However, the next day he called the Leonard Hodge number and the person who had threatened him answered the phone. The telephone number was that of Leonard Hodge, appellants' uncle, with whom Jesse was living. Eric Adams and Jesse Adams were charged with attempting to dissuade a witness by threat of force, making a criminal threat, and conspiracy to commit witness intimidation in counts 1, 3, and 4. Eric was charged in count 2 with attempting to dissuade a witness while having a prior conviction for witness dissuasion.

Counts 5 through 10 charged unlawfully causing a fire to an inhabited dwelling, attempting to dissuade a witness by threat of force in violation of Penal Code section 136.1, and conspiracy to violate section 136.1. [FN4] About a week after receiving the threatening phone call, Huber arrived home at the end of the day and his grandfather told him that someone had just rung the doorbell. Huber went out and looked around, but did not see anything. On April 3, 2005, Justin Perez called Huber, sounding nervous and shaken, and told Huber that "a bomb went off on his porch." Perez asked Huber to come over and he did so. Huber described the scene at the Perez home. He testified, "The front door was all burnt. There was black soot up all the walls.... [T]he doormat was burnt. All the plants were burnt; the smell of gas." The responding San Jose police officer found a lighter and a rolled-up newspaper that smelled of gas on the front porch near the front door of the Perez home. On the walkway leading to the front porch the officer found a small plastic container commonly used to store gasoline. An arson investigator who testified as an expert witness determined that the fire had been set deliberately using gasoline as an accelerant and a lighted, rolled-up newspaper to ignite it.

FN4. Eric Adams and Shante Adams, but not Jesse Adams, were charged in these counts.

The fire at the Perez home prompted Huber, fearing for his safety and that of his family, to report the threatening phone call that he had received to the police. A few days later, Huber was called to the San Jose Police Department. Parole Agent Joseph Montiel and another officer played a tape recording for him. Huber recognized the voice on the tape and was positive that it was the same one that he had heard during the threatening phone call. The voice on the tape was that of Jesse Adams. A few weeks later, a detective played three more tape recordings for Huber. Again, Huber recognize the voice that he had heard during the threatening phone call. Again, the voice was that of Jesse Adams. The voices that Huber did not recognize were those of Leonard Hodge and his son.

At the time of the firebombing Perez told an officer that, when he was trying to put out the fire, he saw a white, older model, American-made sedan, possibly a Cadillac, with tinted windows and lowered body, driving slowly past his house. He told the officer that "it was the same type of vehicle" that he had seen Eric driving at the time of the August 2004 threats. On April 20, 2005, the police seized and impounded Shante Adam's white car, which Eric had been driving on August 23, 2004. The car was registered to Shante Adams and was parked in front of her house. Detective Fischer of the San Jose Police Department testified that when the car was opened up at the impound yard he could smell a "faint smell of gasoline" inside the car. [FN5]

FN5. Fischer's partner and the tow yard employee both had colds and "couldn't smell" because "their sinuses were plugged up."

On April 24, 2005, Dennis Johnsen, an arson investigator for the Santa Clara County Fire Department went to the tow yard to examine the interior of Shante's white car. Johnsen brought along Rosie, a yellow Labrador retriever who was certified as an "Ignitable, Flammable Liquid Detection Canine." A photograph of Rosie was introduced into evidence. Although Johnsen could not smell any gasoline inside the car, Rosie alerted to some pink cloth by the front passenger seat and the floor mat in the rear on the passenger side. Although no laboratory tests verified the presence of petroleum distillates on samples taken from the car, Johnsen testified that Rosie's nose was more sensitive than the laboratory equipment.

In support of the conspiracy charges, the prosecution introduced evidence concerning phone calls made by Eric, while he was in custody in the Santa Clara county jail, to Shante and Jesse. All inmate telephone calls are recorded and stored, including information about the date and time of the call and the number called. Eric called Jesse several times between March 22 and April 11, 2005. He also called Shante numerous times between March 23 and April 22, 2005. Compact discs of some of these telephones calls, and transcripts of the calls, were introduced into evidence.

Agent Joseph Montiel, a parole agent with the California Department of Corrections and Rehabilitation, testified as "an expert in the area of interpreting street lingo or jail lingo." He said that when Eric discussed his pending case with Jesse and Shante in these conversations, he did not "always speak in a normal, clear manner that you would expect from people in normal, everyday life." He said Eric used "ambiguous ways of phrasing things" and "code words."

Montiel testified that he had listened to a phone conversation between

Eric and Shante that took place the night of March 21. In this conversation, Eric referred to "the German" and the "Mexican dude," and Montiel testified that Eric, by saying that one "ain't shit," meant that one was "not too strong." Eric referred to "the homeowner" and Montiel testified that Eric said, "at first he thought he wasn't shit but then after thinking about it, then he thought that was a threat."

On March 23, Jesse told Eric that "the situation' was going to proceed by Shante taking him to "where it's located." Jesse was going to "talk about family life" with someone. Eric and Jesse expressed concern that the "motherfuckers" might "peep" or "squeal" on Jesse in which case Jesse would be "in the same position" as Eric. Eric said that he "was going to whoop [Shante's] motherfucking ass" and that "these motherfuckers stepped in [his] business." [FN6]

FN6. Jesse responded, "That ain't cool. You be hitting a female.... No violence shit. That's a female." Eric explained, "Hey, sometimes, when you're living with a female, you're going to see, man, sometimes you got to choke that bitch out."

Montiel testified that in another March 23 conversation, Eric called Shante and said that he was "fighting for his life" and that he wanted her to "take his boy to go holler at someone." On March 27, Eric called Shante and told her "you're going to drive him there." He said, "You ain't just going to set my boy up, you know?... Cause you're the reason, remember that." Eric reminded Shante, "I'm in jail because of you." His tone was generally threatening and abusive. [FN7]

FN7. He told Shante, "I don't like you or your family. I think your brother is a mark. I think you're an ugly bitch with a long neck and short hair. I think your momma is a crack fiend. I think your daddy's a child molester."

On March 29, Eric called Jesse and Jesse asked him if he "got the kite" that he had "blasted" to him. Jesse told Eric that there was something that he wanted to tell him but that he "can't talk about." Eric told him, "You got to speak on it cleverly, you know?" Jesse referred to "rat head" and said, "I did it... It was on a different way... Switcherella, you know what I'm talking about?" Montiel testified that Jesse told Eric that "something would happen by the weekend." When Eric asked what would happen, Jesse told him it would be "like Pac does, real thug shit." Montiel explained that "Pac" was a reference to "Tupac Shakur, who was a rapper who rapped about guns, violence, gangs, being a thug, [and] had 'thug life' tattooed on his stomach."

On the evening of April 2, 2005, the day before the Perez house was firebombed, Eric called Jesse and Jesse told him "tonight's the night." Montiel testified that the same evening Eric called Shante, who told Eric that "things were ready" and "it's all gravy." On April 4, 2005, someone called "Johnny" phoned Shante from the jail and asked her "what's up with the kid's folks." Shante said "everything is good." Johnny asked her, "When is the last time you've seen them?" and Shante answered, "yesterday."

On April 6, Eric called Shante and made reference to the video game "Grand Theft Auto." Montiel testified that Eric talked about different parts of the game including the significance of stars and "how the stars go away."

Montiel explained that in Grand Theft Auto "the amount of stars one accumulates signifies the amount or the level that the law enforcement of police are after you." The game gives the player options to "make the stars go away" such as having a stolen car repainted. Eric told Shante "to wash the car to vacuum the car inside and out and to change the floor mats."

On April 20, Eric called Shante and she told him that her car had been impounded. Eric asked Shante if she "had washed the ceezar... like he had suggested." Montiel explained that "ceezar" was "car with 'eez' inserted in the middle of the word." Shante said that she had. On April 22, Eric called Shante and told her "you know if you have any evidence in your car of what you did, you're going to jail."

Montiel also testified about a parole search of the home where Jesse lived with Leonard Hodge. The police seized a letter from Eric to Jesse and a reply letter that Jesse had not finished writing. They also seized documents listing Jesse's address and phone number consistent with the Hodge home.

In his testimony, Eric denied that he conspired to dissuade a witness. He explained that when he said that the "Mexican dude isn't too strong" he may have "been talking about wrestling, sports, ice hockey." Most of his conversations with Jesse were about Jesse trying to find work and that Eric wanted Shante to drive Jesse to places to help him with this. Some of his conversations were about Eric's dissatisfaction with his public defender and his plans to retain private counsel. He testified that he did not know what a "[c]eezar" was. [FN8]

> FN8. Eric suggested that the prosecutor "call [his] fake-ass expert and have him explain."

Jesse testified and denied making the threatening phone call to Huber or being involved in the firebombing of the Perez home. [FN9] He denied speaking in code to Eric and said that in their phone conversations they discussed how he could go about getting a job and Eric's problems with Shante. Jesse said that Tupac Shakur was "a poet" and that a "thug" is "a person that came from nothing... trying to raise from poverty... and trying to do it his way, trying to make it."

> FN9. Jesse Adams was impeached with several prior criminal convictions.

(Op. at 1-11.)

## DISCUSSION

A.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

1    may not grant a petition challenging a state conviction or sentence on the basis of a claim that

2    was reviewed on the merits in state court unless the state court's adjudication of the claim

3    "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

4    clearly established federal law, as determined by the Supreme Court of the United States; or (2)

5    resulted in a decision that was based on an unreasonable determination of the facts in light of the

6    evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).   The first prong applies

7    both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S.

8    362, 384-86 (2000), while the second prong applies to decisions based on factual determinations,

9    *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

10    "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

11    court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

12    law or if the state court decides a case differently than [the] Court has on a set of materially

13    indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A state court decision is an

14    "unreasonable application of" Supreme Court authority, falling under the second clause of

15    § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

16    Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

17    case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because

18    that court concludes in its independent judgment that the relevant state-court decision applied

19    clearly established federal law erroneously or incorrectly." *Id.* at 411.

20    In determining whether the state court's decision is contrary to, or involved an

21    unreasonable application of, clearly established federal law, a federal court looks to the decision

22    of the highest state court to address the merits of a Petitioner's claim in a reasoned decision.

23    *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that decision is the opinion of

24    the California Court of Appeal.

25    B.    Petitioner's Claim

26    As grounds for federal habeas relief, Petitioner claims that: (1) the trial court erred in

27    failing to sua sponte instruct the jury on all the elements of dissuading a witness by threat or

28    force which lowered the prosecution's burden of proof; and (2) there was insufficient evidence to

1   support the conviction for making criminal threats.[2]

2       1.   Jury Instruction

3       Petitioner first claims that the trial court erred when it failed "to instruct sua sponte on

4   the elements of the crime of dissuading a witness by threat or force under section 136.1" (Pet. at

5   6.)  Respondent admits that although Petitioner was charged with violating § 136.1 (attempting

6   to dissuade a witness from attending or giving testimony by force or threat of force), the jury was

7   instructed on § 137, which is attempting by force or threat of force to induce another to withhold

8   true testimony.  (Ans. at 7.)

9        The Court of Appeal summarized what transpired as follows:

10           Appellants were charged in counts 1, 2, and 6 with violating Penal Code
        section 136.1. [FN10] Counts 4 and 10 each charged a violation of Penal Code
11      section 182, conspiracy, with the target crime being a violation of Penal Code
        section 136.1.  Although counts 1, 2, and 6 each charged a violation of Penal
12      Code section 136.1, the trial court instructed concerning these counts with
        CALCRIM No. 2620, which is the jury instruction that defines a violation of
13      Penal Code section 137. [FN11] For the conspiracy counts alleging the target
        crime of a violation of section 136.1, the trial court again defined the elements of
14      a violation of section 136.1 by using CALCRIM No. 2620, the instruction which
        defines the elements of a violation of Penal Code section 137.

15
            FN10. Eric Adams and Jesse Adams were charged in count 1, with Huber
16      as the named victim, and Eric was charged in count 6, with Perez as the
        named victim, with violating section 136.1, subdivision (c)(1). Count 2
17      named Huber as the victim, and alleged the same time period as count 1,
        but charged Eric Adams with violating Penal Code section 136.1,
18      subdivision (c)(3), which prohibits attempting to dissuade a witness from
        testifying through threat of force after having suffered a prior conviction
19      for this offense.

20          FN11. When the prosecutor requested jury instructions, he specifically
        asked the court to give CALCRIM No. 2620 for counts 1 and 6 and
21      CALCRIM No. 2622 for count 2 and as a lesser offense to counts 1 and
        6. When the trial court placed on the record a summary of the "lengthy
22      discussions which went on for probably a day total" about jury
        instructions, the court said "We went over each instruction word by word
23      twice, sometimes three or four times, so this doesn't reflect our total
        conversations, this just reflects our debated issues." No mention was
24      made of the instructions discussed here.

25  ─────────────────

26      [2] Although Petitioner proffered four claims in his petition, the Court found after an initial
    review that Claims 1 and 3 could be subsumed into one, as could Claims 2 and 4.  The Court
27  directed Petitioner to file an amended petition should he disagree with the Court's assessment.
    (See Docket No. 4.)  Petitioner did not do so.  Accordingly, the action proceeded on these 2
28  claims.

Penal Code section 136.1, subdivision (c)(1), is violated by one who "knowingly and maliciously" attempts "to prevent or dissuade any witness or victim from attending or giving testimony at any trial... [w]here the act is accompanied by force or by an express or implied threat of force of violence, upon a witness or victim or any third person...." Penal Code section 137 is violated by one who "attempts by force or threat of force... to induce any person to give false testimony or withhold true testimony... from a law enforcement official." Eric Adams points out, "Sections 136.1 and 137 are directed at different goals, the former at preventing testimony at all and the latter at influencing whatever testimony is given. (*People v. Womack* (1995) 40 Cal.App.4th 926, 931.) Further, unlike section 136.1, section 137 does not require a 'malicious' mental state on the part of the accused."

Using the language of CALCRIM No. 2620, the trial court told the jury, "This next instruction relates to dissuading a witness. [¶] Defendants Eric Adams and Jesse Adams are charged in Count 1, and defendant Eric Adams is charged in Count 6, with using force or threatening to use force against a person to cause that person to give false testimony or information or withhold true testimony or information. ¶] This instruction I am now reading is also for your consideration of the definitions and elements of the target crimes within the conspiracy charges found in Counts 4, 7, and 10. [¶] To prove the defendant guilty of the crime charged in Count 1, the People must prove: One, the defendant or person for whose actions the defendant is liable... used force or threatened to use force against Christopher Huber; and two, when the defendant... used force or made the threat, he intended to cause Christopher Huber to give false testimony or withhold true testimony."

CALCRIM No. 2622 provides, "To prove that the defendant is guilty of [a violation of Penal Code section 136.1], the People must prove that : (1) The defendant maliciously tried to prevent or discourage the witness from attending or giving testimony at trial, and... 3) The defendant knew he was trying to prevent or discourage the witness from attending or giving testimony at trial and intended to do so." It further provides, "A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any with the orderly administration of justice." The instruction defines a "witness" and states, "It is not a defense that the defendant was not successful in preventing or discouraging the witness. It is not a defense that no one was actually physically injured or otherwise intimidated."

Eric Adams argues, "Because it described a different offense from that charged against either defendant, CALCRIM 2620 did not provide the jurors any guidance regarding the offense they were charged with adjudicating. The jurors were erroneously told that all they needed to find in order to (a) convict appellants on Counts 1 and 6, and (b) find the necessary criminal objective to the conspiracies alleged in Counts 4 and 10, was that appellant (or his co-conspirator) knowingly 'used force or threatened to use force against' Huber and Perez, in order to cause either of those witnesses to 'give false testimony or withhold testimony.' ... The instruction did not require the jurors to find that appellant specifically intended to dissuade Huber or Perez from giving any testimony at all or that his intent must have been malicious. Further, it permitted the jurors to find appellant guilty based on an erroneous legal theory that knowingly seeking to induce false testimony constituted a violation of subdivisions (a) and (c) of Penal Code section 136.1."

1    Respondent argues that "the correct instructions were given and the
2    issues resolved against appellants under those completely unobjectionable
     instructions. At most, an ambiguity was created, which, in context, was
3    resolved." For this argument, respondent relies on the fact that the trial court did
     instruct with CALCRIM No. 2622, which defines a violation of section 136.1, at
4    one point during the instructions, and that the trial court instructed the jury to
     "Pay careful attention to all of these instructions and consider them together" and
     that "Some of these instructions may not apply."
5
6         The court did give CALCRIM No. 2622, the proper instruction when a
     violation of section 136.1 is charged, in instructing the jury on count 2, which
7    charged Eric with a violation of section 136.1, subdivision (c)(2), for the
     telephone call Huber received at the end of March 2005. Count 2 of the
8    information charged that Eric had committed "the crime of dissuading or
     attempting to dissuade a witness/prior conviction for same" in that Eric "did
9    knowingly and maliciously prevent and dissuade and attempt to prevent and
     dissuade a witness and victim, Christopher Huber, from attending and giving
10   testimony at a trial" and had previously been convicted of a violation of Penal
     Code section 136.1. In instructing on this count, the trial court defined the intent
11   for "intimidating a witness" as to "maliciously tr[y] to prevent or discourage [the
     witness] from attending or giving testimony at trial." The trial court also defined
12   "maliciously."

13   (Op. at 11-14.)

14        The Court of Appeal rejected respondent's argument that the jury would have used

15   CALCRIM No. 2622 to cure the misinstruction as to the other counts. The state court was not

16   convinced that the jury "would have taken an instruction that it was specifically told applied only

17   to count 2 and used it to define the elements of other crimes charged that it was specifically told

18   were 'different' than count 2." (*Id.* at 15.) The state court nevertheless rejected Petitioner's

19   claim that the error qualifies as a "structural error" and found that harmless error analysis was

20   appropriate because the record remained unaffected. After reviewing the record, the Court of

21   Appeal concluded that the error was harmless.

22        Instructing the jury with CALCRIM No. 2620 instead of CALCRIM
     No. 2622 did not affect the content of the record. Based on the entire record,
23   the error cannot be considered to have rendered appellants' trial
     fundamentally unfair or to have prevented the trial from reliably serving its
24   function as the means for determining appellants' guilt. In these
     circumstances, reversal based on the error would send the case back for a
25   retrial focused not on the issue omitted by the instruction – that the intent was
     to prevent or discourage the witnesses from attending or giving testimony at
26   trial, rather than to cause the witnesses to give false testimony or withhold
     true testimony – but on contested issues on which the jury was properly
27   instructed. We conclude the proper standard is *Chapman* harmless error.
     (*Chapman v. California, supra*, 386 U.S. at p. 24.) We may affirm the jury's
28   verdict despite the error if, but only if, it appears beyond a reasonable doubt

that the error did not contribute to the verdict. Thus, we affirm despite the error if the jury that rendered the verdict could not rationally have found the elements were unproven; that is, the error is harmless if the record contains no substantial evidence supporting a factual theory under which the elements submitted to the jury were proven but the omitted elements were not. (*Neder v. U.S., supra*, 527 U.S. at pp. 18-20.)

In our review of the record, we find no evidence that would support a factual theory under which the omitted elements were not proven. The information described a violation of section 136.1 as "dissuading or attempting to dissuade a witness by use of force or threat of force" by one who "did knowingly and maliciously prevent and dissuade and attempt to prevent and dissuade a witness and victim... from attending and giving testimony at trial, proceeding an[] inquiry authorized by law, where such act was accompanied by an express and implied threat of force and violence upon the person and property of a witness, a victim and any third person." Counsel for Jesse, perhaps reading from this, told the jury that Jesse was charged "in Count 1 of dissuading or attempting to dissuade by use of force or threat of force, violation of Section 136.1 (c)(1), a felony, did knowingly, maliciously prevent and dissuade and attempt to prevent and dissuade a witness and victim Christopher Huber from attending and giving testimony at trial. [¶] Now, the common thread to Jesse Adams, of course, is this alleged Huber phone call. That is what you're going to have to decide whether or not legitimately, Jesse Adams made that phone call or someone else did." Counsel referred to the conspiracy charge as "the biggy," and said "certainly dissuading a witness or threatening a witness are not legal" but argued that the jury had to determine "whether or not we have an agreement between Jesse Adams and Eric Adams to dissuade the witness." Counsel argued that there was room to doubt whether the phone call that Huber had reported had ever actually been made. Counsel referred to the instructions concerning circumstantial evidence, and the jury's obligation to accept any reasonable interpretation that is favorable to defendant, and argued that the jail recordings could be reasonably interpreted as conversations about Eric encouraging Jesse in his efforts to obtain a job. Counsel argued that the portions of the jail phone recording relied upon by the prosecution did not support the conspiracy charge because the prosecution "selected them out of [the recordings] and then gave them chosen meanings and Mr. Montiel would then confirm whatever [the prosecutor] asked him." He said, "I beg you not to take anything out of context but to look at it together and see what the meaning of the – what the meaning of the whole tape recording is."

Counsel for Eric Adams argued that, after the firebombing, the police, realizing that Eric was in custody and could not have committed the firebombing personally, decided that "maybe somebody assisted him. So let's go through all the phone calls that Mr. Adams has made out, 20 or so phone calls to his brother, probably 100 calls to his wife during that time, and out of it they start drawing words. One word from here, one word from there, maybe a couple here. And they start interpreting that he's involved in some kind of conspiracy. Let's charge conspiracy in every possible way. Aiding and abetting. Some jury is going to see this thing because he has a prior record. They're going to believe, yeah, he's involved in a conspiracy."

As respondent argues, "To the extent the challenged instruction directed the jury to focus on whether appellants' intent was to 'cause that person to give false testimony or information or withhold true testimony or

information,' rather than to prevent or discourage that person from attending or giving testimony at trial, it was an uncontested issue. The fine shade of meaning between these two intents was not an issue. Any juror instructed under either CALCRIM Nos. 2620 or 2622 on these facts would necessarily find that the threats were issued to affect the outcome of trial and whether an acquittal for lack of evidence might be accomplished by completely discouraging a witness's attendance or by causing a witness, although in attendance, to withhold testimony seems a distinction without a difference." This trial fully litigated the central issue of who made the threats to the witnesses, and there is nothing in the record to suggest that any threat was made with an intent inconsistent with a violation of section 136.1 or was not malicious. Accordingly, any error in instructing the jury with CALCRIM No. 2620 was harmless beyond a reasonable doubt.

(Op. at 17-20.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.[3]  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting

---

[3]A "reasonable likelihood" is lower than the "more likely than not" standard but higher than a mere "possibility."  <u>Polk v. Sandoval</u>, 503 F.3d 903, 910 (9th Cir. 2007).

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.  *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

We will assume in accordance with the Court of Appeal's opinion that there was an error in the jury instructions at issue.  The appropriate standard of review on habeas, therefore, is whether the error was harmless.  *See Calderon*, 525 U.S. at 146-47.  Petitioner argues that failure to instruct on the element of "malice" within § 136.1 constitutes structural error.  (Pet. at 6.) However, it is well established that a jury instruction that omits an element of an offense is constitutional error subject to "harmless error" analysis.  *See Neder v. United States*, 527 U.S. 1, 8-11 (1999) (direct review); *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003) (§ 2254 case); *Spicer v. Gregoire*, 194 F.3d 1006, 1008 (9th Cir. 1999) (§ 2254 case).  The omission will be found harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.."  *See California v. Roy*, 519 U.S. 2, 4 (quoting *Brecht*, 507 U.S. at 637); *see Roy v. Gomez*, 108 F.3d 242, 242 (9th Cir. 1997) (on remand after *California v. Roy*).  Accordingly, Petitioner is entitled to federal habeas relief only if there is a reasonable probability that the jury could not have found Petitioner guilty of violating § 136.1 based on the evidence presented.  *Id.*

Here, it is clear that the error in the jury instruction was harmless because there was sufficient evidence to support a jury finding that Petitioner was guilty of violating § 136.1, *i.e.*, that he knowingly and maliciously tried to prevent or discourage witnesses from attending or giving testimony at trial by use of force or threat of force.  The jury was presented with detail evidence of the threatening phone calls to Christopher Huber linked to Petitioner, the firebomb on the Perez home, the numerous phone calls between Petitioner and Eric Adams, and the opinion of the expert witness who interpreted the street and jail lingo used.  As the state appellate court found, "[a]ny juror instructed under either CALCRIM Nos. 2620 or 2622 on these facts would necessarily find that the threats were issued to affect the outcome of trial and

1  whether an acquittal for lack of evidence might be accomplished by completely discouraging a

2  witness's attendance or by causing a witness, although in attendance, to withhold testimony

3  seems a distinction without a difference." *See supra* at 13.

4        Petitioner also claims that the trial court violated his rights because it failed to instruct on

5  all the elements of § 136.1, specifically on "malice." (Pet. Attach. at 6.) CALCRIM No. 2620

6  defines "malice" as follows: "A person acts maliciously when he or she unlawfully intends to

7  annoy, harm, or injure someone else in any way, or intends to interfere in any with the orderly

8  administration of justice." *See supra* at 9. Based on the evidence in the record, there is a

9  reasonable probability that the jury would have found that Petitioner acted maliciously when he

10  made criminal threats to Huber on the phone and when he firebombed the Perez home with the

11  intent of dissuading them from testifying at trial. As Respondent asserts, a "benign state of mind

12  is inconsistent with the use of violence or threats of violence to achieve the objective." (Ans. at

13  14.) In sum, Petitioner has failed to show that the error in jury instructions had a substantial and

14  injurious effect or influence in determining the jury's verdict to warrant federal habeas relief.

15  *See Brecht*, 507 U.S. at 637; *Calderon*, 525 U.S. at 146-47.

16        2.   <u>Insufficient Evidence</u>

17        Petitioner's second claim is that there was insufficient evidence to support the conviction

18  for making criminal threats. Specifically, Petitioner was convicted of making a criminal threat to

19  Christopher Huber during the telephone call to Huber in late March 2005. In his appeal,

20  Petitioner argued the following: "Appellant's count three conviction of making criminal threats

21  under section 422 must be reversed because it is unsupported by sufficient evidence showing that

22  Huber experience 'sustained fear' as a result of the telephone call on March 29 or March 30.

23  This conviction based on insufficient evidence denied appellant's constitutional rights to due

24  process and a fair trial."

25        The Court of Appeal denied the claim on appeal, finding there was sufficient evidence to

26  support the conviction.

27              "To determine sufficiency of the evidence, we must inquire whether a
rational trier of fact could find defendant guilty beyond a reasonable doubt. In

28  this process we must view the evidence in the light most favorable to the

judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole." (*People v. Johnson* (1993) 6 Cal.4th 1, 38.)

Under Penal Code section 422, a threat to commit a crime that will result in death or great bodily injury to another person is a criminal threat if, "on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."

The requirement of section 422 that the threat must cause the victim "reasonably to be in sustained fear for his or her own safety" " has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140.) There is no precise definition of or limitation on the amount of time a victim must experience fear in order to satisfy this element of section 422. However, "sustained fear" has been described as "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Threats are judged in their context and not solely on the specific words that were spoken. "[A]ll of the circumstances can and should be considered in determining whether a terrorist threat has been made." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1014.) "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning. [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 635.) Although nonverbal conduct alone is insufficient, a combination of words and gestures may constitute a terrorist threat under section 422. (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1442-1446.)

...

**Huber – The Telephone Call**

Appellants contend, "Appellant's judgment must be reversed because there was no substantial evidence that Huber experienced sustained fear as a result of the telephone call made between March 29 and March 31, 2005 as alleged in count 3."

The voice that called Huber near the end of March said, "People that talk, wind up in graves." The man said, "You got a nice house, nice kids. You don't want to lose them.... Do the right thing. You don't want to wind up dead." Huber understood that by "talk" the caller meant "testify." When asked if he took this call as a threat to his safety, he answered, "Absolutely." Huber said that he considered the call a threat to his safety, that of his family, and that of Justin Perez and his family. However, he testified that he did not immediately report this call to the police "[b]ecause until what happened later, I just though it was all B.S." He said, "I didn't give it much merit until the

1

2

firebombing." When the Perez home was firebombed, Huber told the police about the call. Huber testified that he felt fear for his safety and that of his family and that, as of the time of his testimony at trial, he was still in fear for his safety, that of his family, and that of the Perez family.

3

4

5

6

7

8

9

10

Jesse Adams argues, "The question in the instant case is whether Huber's delayed fear, the fear he experienced one week later when [Justin] Perez's house was firebombed, constitutes 'sustained fear' within the meaning of section 422. The language of the statute itself requires the conclusion that delayed fear fails to satisfy its sustained fear element, by its emphasis on temporal immediacy in connection with the fear." Appellant Eric Adams argues that "the fear engendered was not due to the statement, but due to the conduct... though later conduct may inform whether the declarant intended a statement to be a threat at the time it was made (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013-1014), such later conduct cannot instill retroactive fear." Respondent argues, "It may have taken the firebombing of the Perez house to trigger Huber's report to the police that he, too, had been the object of continued terrorism related to his witnessing of the events of August 23, 2004, but that delay neither invalidates his testimony that he was frightened by the telephone call, nor renders his fear unreasonable."

11

12

13

14

15

16

17

18

19

20

*People v. Solis* considered whether a threat that may not initially create sustained fear but does so when the threat is followed by subsequent action qualifies under section 422. In *Solis*, the defendant left a series of messages on his ex-girlfriend's answering machine threatening that he was driving to her home to set fire to it and to kill her. (*Solis, supra,* 90 Cal.App.4th 1002, 1009.) The court held that the defendant's conduct after the verbal statement-setting fire to the ex-girlfriend's apartment building using an accelerant thrown through the ex-girlfriend's bedroom window-could be considered in determining whether a criminal threat was made. The court stated, "[I]t is clear a jury can properly consider a later action taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed... The point is that all of the circumstances can and should be considered in determining whether a terrorist threat has been made. It therefore follows that the court, in response to the jury's questions, properly informed the jury that the threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant." (*Id.* at p. 1014.)

21

22

23

24

25

26

27

28

There is no question that the words used during the telephone call here qualified as a threat. The surrounding circumstances support that view and the language of the threat makes clear that it was intended as such, conveying a gravity of purpose and an immediate prospect of execution. Although Huber did not report it to the police until after the firebombing, he did testify that he was placed in fear at the time he received the threat. He thought enough of it to try calling the Leonard Hodge number that had called him earlier, and found the voice that eventually answered at that number to be the same one that had issued the threat. However, even if Huber's fear did not fully ripen until the firebombing of the Perez home, it was the phone threat which caused him to be in fear for his safety and that of his family. That fear continued as of the time he testified at trial. The duration of Huber's fear from the point at which he understood, because of appellants' subsequent action, that the threat which had been conveyed to him was not "all B.S.," until he testified at trial supports the element that Huber experienced sustained fear. There was

1        substantial evidence as to count 3.

2    (Op. at 23-29.)

3        The Due Process Clause "protects the accused against conviction except upon proof

4    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5    charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

6    evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

7    a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

8    claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to

9    federal habeas relief, *see id.* at 324.  *See, e.g.*, *Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th

10   Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses

11   to be admitted into evidence without authenticating testimony relieved state of its burden to

12   prove beyond reasonable doubt all elements of crime charged); *Martineau v. Angelone*, 25 F.3d

13   734, 739-43 (9th Cir. 1994) (writ granted where evidence found insufficient to convict

14   defendants of child abuse based on delay in seeking medical care for child).

15       A federal court reviewing collaterally a state court conviction, as in the case at bar, does

16   not determine whether it is satisfied that the evidence established guilt beyond a reasonable

17   doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993).  The

18   federal court "determines only whether, 'after viewing the evidence in the light most favorable to

19   the prosecution, any rational trier of fact could have found the essential elements of the crime

20   beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of

21   fact could have found proof of guilt beyond a reasonable doubt, has there been a due process

22   violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988,

23   992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and

24   cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert.

25   denied*, 469 U.S. 838 (1984).

26       According to the state appellate court, California case law makes clear that "[t]he phrase

27   to 'cause[ ] that person reasonably to be in sustained fear for his or her own safety' has a

28   subjective and an objective component" and that a "victim must actually be in sustained fear, and

1   the sustained fear must also be reasonable under the circumstances." *See supra* at 16, quoting *In*

2   *re Ricky T.,* 87 Cal.App.4th at 1140.  The state court also noted that "'sustained fear' has been

3   described as 'a period of time that extends beyond what is momentary, fleeting, or transitory.'"

4   *Id.* at 16, quoting *Allen*, 33 Cal.App.4th at 1156.  A state court's interpretation of state law,

5   including one announced on direct appeal of the challenged conviction, binds a federal court

6   sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S.

7   624, 629 (1988).  The state's highest court is the final authority on the law of that state.

8   *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).  Even a determination of state law made by

9   an intermediate appellate court must be followed and may not be "'disregarded by a federal court

10  unless it is convinced by other persuasive data that the highest court of the state would decide

11  otherwise.'"  *Hicks*, 485 U.S. at 630 n.3 (quoting *West v. American Telephone & Telegraph Co.*,

12  311 U.S. 223, 237-38 (1940)).

13          Viewing the evidence here in the light most favorable to the prosecution, it is clear that

14  any rational trier of fact could have found that Petitioner made criminal threats within the

15  meaning of § 442, including causing Huber "reasonably to be in sustained fear" for his safety

16  and that of his immediate family.  Pen. Code § 442.  The state court found that the words

17  themselves constituted a threat: in the phone call, Petitioner referenced the encounter between

18  his brother Eric, Huber and the Perez family; addressed Huber by his first name; warned him that

19  "people who talk wind up in graves"; mentioned Huber's "nice house" and "nice kids" and that

20  he did not want to lose them; and that Huber should "do the right thing," *i.e.,* not testify, because

21  he "[didn't] want to wind up dead."  *See supra* at 16.  Petitioner was clearly threatening Huber's

22  life, his kids and property should Huber testify regarding the August 23, 2004 incident.

23  Furthermore, although Huber may have dismissed the phone call initially as "all B.S.,"

24  Petitioner's statements could later be seen as threats based upon a subsequent action taken by

25  Petitioner, which in this case was the firebombing.  Under California law, a threat that may not

26  initially create sustained fear for the victim does so when the threat is followed by subsequent

27  action and thereby qualifies under § 422.  *See Solis*, 90 Cal.App.4th at 1013-1014.  Consistent

28  with *Solis*, the state court found that "even if Huber's fear did not fully ripen until the

1   firebombing of the Perez home, it was the phone threat which caused him to be in fear for his

2   safety and that of his family.  That fear continued as of the time he testified at trial.  The duration

3   of Huber's fear from the point at which he understood, because of [Petitioner's] subsequent

4   action, that the threat which had been conveyed to him was not 'all B.S.,' until he testified at trial

5   supports the element that Huber experienced sustained fear."  *See supra* at 17.  This Court is

6   bound on federal habeas by the state court's interpretation of its own laws.  *Bradshaw*, 546 U.S.

7   at 76.  Accordingly, it cannot be said that the California Court of Appeal's rejection of this

8   claim was contrary to or was an unreasonable application of clearly established federal law.  28

9   U.S.C. § 2254(d)(1).

10

11                                   **CONCLUSION**

12          For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

13          The federal rules governing habeas cases brought by state prisoners require a district

14   court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

15   ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

16   not shown "that jurists of reason would find it debatable whether the petition states a valid claim

17   of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

18   Accordingly, a COA is DENIED.

19          The Clerk shall close the file.

20          IT IS SO ORDERED.

21   DATED: ___12/16/11_____

22                                   LUCY H. KOH
                                     United States District Judge

23

24

25

26

27

28